UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | |
|---|---|
| Priority | ____ |
| Send | ____ |
| Enter | ____ |
| Closed | ____ |
| JS-5/JS-6 | ____ |
| Scan Only | ____ |

**CASE NO.:** CV 15-05202 SJO (JCx)      **DATE:** November 10, 2015

**TITLE:** Timeplay, Inc. v. Audience Entertainment LLC

========================================================================
**PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                                        Not Present
Courtroom Clerk                                      Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**          **COUNSEL PRESENT FOR DEFENDANT:**

Not Present                                           Not Present

========================================================================
**PROCEEDINGS (in chambers): ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR LACK OF PATENTABLE SUBJECT MATTER** [Docket No. 19]

This matter comes before the Court on Defendant Audience Entertainment LLC's ("Defendant") Motion to Dismiss for Lack of Patentable Subject Matter ("Motion"), filed September 3, 2015. Plaintiff TimePlay, Inc. ("Plaintiff") filed an opposition to the Motion ("Opposition") on September 28, 2015, to which Defendant filed a Reply ("Reply") on October 5, 2015. The Court found this matter suitable for disposition without oral argument and vacated the hearing set for October 19, 2015. *See* Fed. R. Civ. P. 78(b). For the reasons stated below, the Court **DENIES** Defendant's Motion.

I.    FACTUAL AND PROCEDURAL HISTORY

On July 9, 2015, Plaintiff filed a Complaint for Patent Infringement ("Complaint") against Defendant alleging Defendant infringes United States Patent Number 8,951,124 ("the '124 Patent") through its making, selling, offering for sale, using, or importing gaming systems, including the systems that control a mobile game known as "Terminator: Genisys." (Compl. ¶¶ 5, 9, ECF No. 1.)

The '124 Patent, which issued on February 10, 2015, is directed to systems that permit multiple users to play a game on a primary game display using handheld game controllers that have interactive secondary displays. ('124 Patent cols. 41-44.) The '124 Patent contains three independent claims—claims 1, 37, and 38—and thirty-five dependent claims, each of which is dependent on claim 1. (*Id.*) Representative claim 1 recites:

1. A **multi-player game system** comprising:
    a.    a **game server** configured to run a game software to facilitate a multi-player game, the game server further configured to provide display signals for displaying the multi-player game;
    b.    a **display system having primary display means**, the display system being configured to provide a *primary game display* of the multi-player game on the primary display means in response to the display signals;

    c.    a plurality of **handheld game controllers**, each handheld game controller having *secondary display means* and *input means*; and
    d.    **communication controller** for enabling communication between the game server and each handheld game controller;
    e.    wherein the plurality of handheld game **controllers are located in proximity to the primary display means** such that the primary display means is visible to game players manipulating respective handheld game controllers; and
    f.    wherein the game **server is configured to download a game software module to each handheld game controller** using the communication controller prior to initiation of the multi-player game, each game software module executable by the corresponding handheld game controller to enable the corresponding handheld game controller to provide a **secondary game display** on the secondary display means in response to player input received at the input means, wherein the secondary game display is complementary to the primary game display, and to enable participation in the multi-player game by the corresponding game player.

('124 Patent col. 41:22-52 (emphasis added).)

Claim 37 differs from claim 1 through the inclusion of additional limitations differentiating between "local" and "remote" game controllers. In particular, claim 37 recites both "a plurality of handheld **local** game controllers" and "at least one handheld **remote** game controller located remotely from the primary display means and having secondary display means and input means, the at least one handheld remote game controller being in communication with the game server over a network." ('124 Patent col. 44:1, 12-17 (emphasis added).) Claim 37 requires that

> the game server is configured to download a game software module to the at least one handheld **remote** game controller **over the network** prior to initiation of the multi-player game, the game software module executable by the corresponding handheld remote game controller to enable the corresponding handheld remote game controller to provide a secondary game display on the secondary display means in response to player input received at the input means of the handheld remote game controller, wherein the secondary game display is complementary to the primary game display, and to enable participation in the multi-player game by a corresponding game player.

('124 Patent Col. 44:19-32 (emphasis added).) Claim 37 does not impose a similar requirement on the handheld local game controllers.

Claim 38, by contrast, is identical to claim 1 except with respect to the final limitation, where claim 38 imposes the following additional bolded requirement:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.:   CV 15-05202 SJO (JCx)                    DATE: November 10, 2015

> wherein the game server is configured to download a game software module to each handheld game controller using the communication controller prior to initiation of the multi-player game, each game software module executable by the corresponding handheld game controller **to facilitate game activities corresponding to the multi-player game,** to enable the corresponding handheld game controller to provide a secondary game display on the secondary display means in response to player input received at the input means, wherein the secondary game display is complementary to the primary game display, and to enable participation in the multi-player game by the corresponding game player.

('124 Patent col 44: 51-64 (emphasis added).)

Although the '124 Patent issued on February 10, 2015, a provisional patent application leading to the '124 Patent was filed on September 21, 2004. ('128 Patent [60].) The prosecution history of the '124 Patent reveals that on October 6, 2012, a Patent and Trademark Office ("PTO") Examiner (the "Examiner") rejected each then-pending claim of the '124 Patent as obvious in light of certain pieces of prior art disclosing multi-player gaming systems. (*See* Decl. Edwin Steussy in Supp. Opp'n ("Steussy Decl."), Ex. 2.) In response to this rejection, on April 11, 2013 the patent applicant further amended claims 1, 36, and 38 to include a new limitation that the game server be configured to download a game software module to the controllers. (Steussy Decl., Ex. 3 at 34, 39-40.) A non-final rejection issued on May 20, 2013, in which the Examiner again rejected each then-pending claim on obviousness grounds in light of other multi-player gaming patents and publications. (*See* '124 Patent, May 20, 2013 Non-Final Rejection.) On September 20, 2013, the patent applicant again amended certain claims and clarified that the claimed "game-specific software module is not the same as a multi-player game," thus distinguishing the prior art. (Steussy Decl., Ex. 4 at 56.) The patent subsequently issued. (Steussy Decl., Ex. 5.)

II.     DISCUSSION

In the Motion, Defendant argues each of the claims of the '124 Patent is not patent-eligible under 35 U.S.C. section 101 ("Section 101") because the claims are "nothing more than the abstract idea of allowing multiple people to play a game together on a shared display using generic computer and communications hardware." (Mot. 1.) Plaintiff responds that Defendant has failed to meet its burden of proving patent-ineligibility, as (1) Defendant has not articulated any "abstract" idea claimed by the '124 Patent; (2) Defendant's arguments regarding "inventiveness" ignore the specification, claims, prosecution history, and case law; and (3) more generally, Defendant's motion prematurely seeks impermissible claim constructions and validity findings. (*See generally* Opp'n.) With counsel's arguments laid out, the Court surveys recent developments in Section 101 jurisprudence.

   A.    Section 101 Analytical Framework

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  <u>CV 15-05202 SJO (JCx)</u>        DATE:  <u>November 10, 2015</u>

"Section 101 defines the subject matter that may be patented under the Patent Act."  *Bilski v. Kappos*, 561 U.S. 593, 601 (2010).  Section 101 reads in its entirety:  "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  "Section 101 thus specifies four independent categories of inventions or discoveries that are eligible for patent protection:  processes, machines, manufactures, and compositions of matter."  *Bilski*, 561 U.S. at 601.

Although acknowledging that "[i]n choosing such expansive terms . . . Congress plainly contemplated that the patent laws would be given wide scope," the Supreme Court long ago identified three exceptions to Section 101:  "laws of nature, physical phenomena, and abstract ideas."  *Diamond v. Chakrabarty*, 447 U.S. 303, 308-09 (1980).  Although these exceptions are not required by the statutory text, they are consistent with the idea that certain discoveries "are part of the storehouse of knowledge of all men" and are "free to all men and reserved exclusively to none."  *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948).  Thus, "the concern that drives this exclusionary principle [is] one of pre-emption."  *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 134 S. Ct. 2347, 2354 (2014).  Consequently, the Supreme Court has required that "[i]f there is to be invention from such a discovery, it must come from the application of the law of nature to a new and useful end."  *Funk Bros.*, 333 U.S. at 130.  These principles have been held to apply with equal force to product and process claims.  *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972).

*Alice Corp. v. CLS Bank* ("*Alice*") represents the Supreme Court's latest attempt to clarify how courts should apply these difficult principles.  In *Alice*, the Supreme Court expanded on the two-step approach for resolving Section 101 issues first articulated in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. —, 132 S. Ct. 1289, 1296-97 (2012).  First, a court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts."  *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 566 U.S. at —, 132 S. Ct. at 1296-97).  If so, then the court must ask "[w]hat else is there in the claims," which requires consideration of "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application."  *Id.* (citing *Mayo*, 132 S. Ct. at 1297-98).  In this second step, the court must "search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."  *Id.* (citing *Mayo*, 132 S. Ct. at 1294).  This two-step analytical framework has been labeled the "*Alice/Mayo* test."

Nevertheless, "Judges of this Court have recognized that the two steps of the *Alice/Mayo* test are easier to separate in recitation than in application."  *Ameranth, Inc. v. Genesis Gaming Solns., Inc.*, No. CV 11-00189 AG, 2014 WL 7012391, at *2 (C.D. Cal. Nov. 12, 2014) (internal citations omitted).  Another court in this district has stated that "[d]escribing this as a two-step test may overstate the number of steps involved."  *Eclipse IP LLC v. McKinley Equip. Corp.*, No. CV 14-00742 GW, 2014 WL 4407592, at *2-*3 (C.D. Cal. Sept. 4, 2014).

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  <u>CV 15-05202 SJO (JCx)</u>          DATE:  <u>November 10, 2015</u>

As a result, identifying whether a claim is "directed to an abstract idea" under step one of the *Alice/Mayo* test is not always a simple undertaking. Although there is some disagreement among courts as to how expansively a claim should be examined at *Alice/Mayo* step one, the Federal Circuit and courts in this district require that a court examine the *purpose* of a challenged claim to determine whether it is abstract. *See Cal. Inst. Tech. v. Hughes Commc'ns, Inc.*, 59 F. Supp. 3d 974, 991 (C.D. Cal. 2014) (requiring that a court "identify the purpose of the claim—in other words, what the claimed invention is trying to achieve—and ask whether that purpose is abstract," making the *Alice/Mayo* step 1 "a sort of 'quick look' test, the object of which is to identify a risk of preemption and ineligibility"); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258-59 (Fed. Cir. 2014) (although blurring steps one and two in analyzing internet-based patent claims, finding the claims not patent-ineligible where they "specify how interaction with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of the hyperlink").

In instances in which the "purpose" of the claim can be considered "abstract," the patent-eligibility analysis becomes more difficult during the second step of the *Alice/Mayo* test. In *Alice*, the Supreme Court considered whether "[t]he introduction of a computer into the claims" directed toward the abstract idea of intermediated settlement was sufficient to "transform the nature of the claim" by adding an "inventive concept." *Alice*, 134 S. Ct. at 2358. The Supreme Court held that it did not, and made clear that "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* "Nor is limiting the use of an abstract idea 'to a particular technological environment.'" *Id.* (citing *Bilski*, 561 U.S. at 610-11). In its discussion, the Supreme Court in *Alice* distinguished an earlier case, *Diamond v. Diehr*, in which the Court held that a computer-implemented process for curing rubber, which employed a "well-known" mathematical equation, was nevertheless patent-eligible because it used that equation in a process designed to solve a technological problem in "conventional industry practice."[1] *Alice*, 134 S. Ct. at 2358 (citing *Diehr*, 450 U.S. at 177-178).

Lower courts have not been left without any guidance, however. With respect to the "abstract ideas" exception, the Supreme Court has stated that the prohibition embodies "the longstanding rule that '[a]n idea of itself is not patentable.'" *Benson*, 409 U.S. at 67 (quoting *Rubber-Tip Pencil Co. v. Howard*, 20 Wall. 498, 507 (1874)). Following this rule, the Supreme Court has found that claims drawn to mathematical formulae, algorithms, and fundamental economic practices such as intermediated settlement and risk hedging to be directed to "abstract ideas" even where such claims contained computer elements. *See Benson*, 409 U.S. at 71-72 (finding an algorithm for converting binary-coded decimal numbers into pure binary form in a general-purpose digital computer to be "in practical effect . . . a patent on the algorithm itself" and therefore an abstract

---

[1] In particular, the Supreme Court in *Diehr* explained that the claimed contribution to the art was the step of "constantly measuring the actual temperature inside the mold" for the synthetic rubber products. *Diehr*, 450 U.S. at 178, 179 n. 5.

idea); *Parker v. Flook*, 437 U.S. 584, 594-595 (1978) (finding a mathematical formula for computing "alarm limits" in a catalytic conversion process to be an abstract idea); *Alice*, 134 S. Ct. at 2356 ("On their face, the claims before us are drawn to the concept of intermediated settlement, *i.e.*, the use of a third party to mitigate settlement risk."); *Bilski*, 561 U.S. at 611 (finding a patent claiming a "series of steps instructing how to hedge risk" not patent eligible because hedging is a "fundamental economic practice").

Indeed, the Court of Appeals for the Federal Circuit has had occasion to grapple with Section 101 issues in the wake of *Alice*.  Although the Court stops well short of proclaiming that Section 101 presents any sort of bright line, these cases appear to distinguish between patents claiming improvements to modern technology and those claiming well-known concepts untethered to any particular technology or technological environment.  *Compare DDR Holdings,* 773 F.3d at 1258 (finding eligible under Section 101 a patent claiming a method for retaining visitors on a website through the creation of a digital "store within a store," both because "the claims recite an invention that is not merely the routine or conventional use of the Internet," and also because the claims "do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same," but rather claim an "inventive concept for resolving [a] particular internet-centric problem"), *with Ultramercial, LLC v. WildTangent, Inc.*, 772 F.3d 709 (Fed. Cir. 2014) (finding patent-ineligible claims involving the display of an advertisement in exchange for access to copyrighted media, where the limitations "simply instruct the practitioner to implement the abstract idea with routine, conventional activity" and where the "invocation of the Internet also adds no inventive concept"), *cert. denied*, 135 S. Ct. 2907 (2015); *Planet Bingo, LLC v. VKGS LLC*, 576 Fed. App'x 1005 (Fed. Cir. 2014) (finding patent-ineligible claims reciting methods and systems for "managing a game of Bingo" where the claimed computer elements—"a computer with a central processing unit," "a memory," "an input and output terminal," "a printer," possibly "a video screen," and a "program . . . enabling the steps of managing a game of bingo" perform steps of selecting, storing, and retrieving two sets of numbers, assigning a player identifier and a control number, and comparing a winning set of bingo numbers with a selected set of bingo numbers—simply recite a generic computer implementation of the covered abstract idea).

With this fundamental understanding of the purpose and limits of Section 101, the Court addresses whether a motion to dismiss may properly be brought on Section 101 grounds.

    B.    <u>The Appropriateness of Ruling on Section 101 Motions at the Pleadings Stage</u>

Federal Rule of Civil Procedure 12(b)(6) permits a party to move to dismiss an action for "failure to state a claim upon which relief can be granted" if "made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b)(6).  "Patent eligibility under [Section] 101 is a question of law that may, in appropriate cases, be decided on the pleadings without the benefit of a claim construction hearing." *Modern Telecom Sys. LLC v. Earthlink, Inc.*, No. CV 14-0347 DOC, 2015 WL 1239992, at *6 (C.D. Cal. Mar. 17, 2015) (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) (affirming district court's

decision to grant motion to dismiss based on patent-ineligible subject matter under Section 101 without having a claim construction hearing); *Ultramercial*, 772 F.3d at 711 (same)).  However, "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a [Section] 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter."  *Bancorp Servs., L.L.C. v. Sun Life Assurance. Co. Can. (U.S.)*, 687 F.3d 1266,1273-74 (Fed. Cir. 2012); *see also Content Extraction*, 776 F.3d at 1349 ("Although the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable prerequisite to a validity determination under [Section] 101.").

    C.    <u>Defendant's Burden</u>

"Although the clear and convincing evidence standard is not applicable" to a Section 101 motion brought pursuant to Federal Rule of Civil Procedure 12(b)(6), the movant "still bear[s] the burden of establishing that the claims are patent-ineligible under [Section] 101."  *Modern Telecom Systems*, 2015 WL 1239992, at *8.  "Additionally, in applying [Section] 101 jurisprudence at the pleading stage, the Court construes the patent claims in a manner most favorable to Plaintiff."  *Id.* (citing *Content Extraction*, 776 F.3d at 1349).

    D.    <u>Analysis</u>

Having determined that the Court can rule on Defendant's Motion at the pleadings stage, the Court now applies the *Alice/Mayo* test to determine whether the claims of the '124 Patent are patent-ineligible.  Before diving into step one, however, the Court notes that Defendant's arguments principally relate to patent-eligibility of claim 1 of the '124 Patent, which Defendant argues is "representative" of the two other independent claims and the many dependent claims for the purposes of the Section 101 analysis. (Mot. 15.) Plaintiff disputes the representativeness of claim 1.  (*See generally* Opp'n.)  Because the Court finds Defendant has failed to meet its burden of proving the patent-ineligibility of claim 1, which the parties do not dispute is the broadest of the '124 Patent's claims, the Court need not determine whether claim 1 is indeed representative.

    1.    <u>Step 1:  Whether the Claims are Directed to a Patent-Ineligible Abstract Idea</u>

The first step in determining whether a claim satisfies Section 101 is determining whether the claim at issue is directed to a "patent-ineligible concept" such as an abstract idea.  *Alice*, 134 S. Ct. at 2355.  Defendant argues that although the patent specification describes a variety of embodiments of systems that allow multi-player gaming with a shared display, and even provides some specifics as to how it contemplates those systems would be designed, the claims themselves are directed to the idea of allowing multiple people to play a game together using generic computer and communications hardware.  (Mot. 5.)  According to Defendant, "when all of the claim's generic computer and communications components . . . are stripped away, all that remains is the underlying concept of multi-player gaming using a hand-held controller that has a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.:   CV 15-05202 SJO (JCx)            DATE:   November 10, 2015

display screen where the players are also in front of a shared display." (Mot. 6.) Indeed, Defendant argues "it is hard to think of a way to organize human activity that is more fundamental to the human existence or more ubiquitous than interactive game play with multiple people.

Plaintiff responds that Defendant's "fundamental failure here is its inability to articulate any '*abstract* idea' encompassed by the '124 Patent." (Opp'n 9.) Rather, according to Plaintiff, Defendant's purported "abstract idea" is far more general than anything claimed in the '124 Patent. (*Id.* at 10.) Principally, Plaintiff contends that "[i]n reality, the '124 Patent only exists in the field of multi-player video gaming" and that the claims "have core distinguishing features that a family playing Pictionary would never dream were necessary on game night." (*Id.*)

As articulated by another court in this district, "[t]he characterization of the claim is essential to the [Section] 101 inquiry." *Cal. Inst. Tech. v. Hughes Commc'ns, Inc.*, 59 F. Supp. 3d 974, 991 (C.D. Cal. 2014). Under the first step of the *Alice/Mayo* test, "the court must identify the purpose of the claim—in other words, what the claimed invention is trying to achieve—and ask whether that purpose is abstract." *Id.* Here, '124 Patent provides in the "Background of the Invention" that the purpose of the invention is to "ameliorate one or more shortcomings of existing multi-player gaming systems," in particular the difficulties of identifying one's game character on a large screen and providing a practical and cost-effective means to manage game input commands where numerous players and associated game characters are present. ('124 Patent col. 1:35-47.)

With this understanding of the goals of the '124 Patent, Defendant has failed to meet its burden of establishing that the '124 Patent is "directed to an abstract idea." The parties appear to agree that the '124 Patent is directed to the "idea of multi-player gaming using a hand-held controller that has a display screen where the players are also in front of a shared display." (*See* Opp'n 12-13; Reply 1.) Defendant has not pointed to any authority compelling the conclusion that such an idea, which is by definition limited to the field of multi-player gaming and which requires the use of multiple hardware components—unlike the claims in *Bilski* and *Alice* which, at least in theory, could be performed without a computer—is "abstract" within the meaning of Section 101. Moreover, Defendant's argument that Plaintiff "does not actually explain how any of the components identified by [Defendant] are not generic, let alone why any of those components actually make the claim less abstract under Step One" misreads Supreme Court and Federal Circuit precedent, which make clear that "recitation of **generic computer limitations** does not make an otherwise ineligible claim patent-eligible," but do not broadly hold that courts must "strip away" each claim element that recites hardware **containing** computing elements, such as a video game controller, when performing step one of the *Alice*/*Mayo* test. *DDR Holdings*, 773 F.3d at 1256 (emphasis added). Accordingly, Defendant has failed to meet its burden of proving that the '124 Patent claims are "directed to an abstract idea."

        2.      Step 2:  Whether the Claims Include an "Inventive Concept" Sufficient to "Transform the Nature of the Claim" into a Patentable Invention

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  CV 15-05202 SJO (JCx)     DATE:  November 10, 2015

Nevertheless, even if the '124 Patent could be considered to be "directed to an abstract idea," Defendant has failed to meet its burden of establishing that the elements of the '124 Patent, when viewed alone or in combination, do not contain an "inventive concept" sufficient to "transform the nature of the claim" from a purported abstract idea into a patentable invention.  *Alice*, 134 S. Ct. at 2355.

First, notwithstanding the necessary inclusion of certain general-purpose computer terms such as "server" and "communication controller," the claims of the '124 Patent do not embody, much less recite, any of the categories of ideas held by the Supreme Court to be "abstract."  Even under Defendant's "constructions," the claims do not recite mathematical formulae, algorithms, computer software, or fundamental business practices such as risk hedging or intermediated settlement that run a significant risk of preemption even when limited to the world of computing.  *See Benson*, 409 U.S. at 71-72 (finding an algorithm for converting binary-coded decimal numbers into pure binary form in a general-purpose digital computer to be "in practical effect . . . a patent on the algorithm itself" and therefore an abstract idea); *Flook*, 437 U.S. 584, 594-595 (1978) (finding a mathematical formula for computing "alarm limits" in a catalytic conversion process to be an abstract idea); *Alice*, 134 S. Ct. at 2356 ("On their face, the claims before us are drawn to the concept of intermediated settlement, i.e., the use of a third party to mitigate settlement risk."); *Bilski*, 561 U.S. at 611 (finding a patent claiming a "series of steps instructing how to hedge risk" not patent eligible because hedging is a "fundamental economic practice").  Although Defendant argues that the claims of the '124 Patent are directed to "a system that enables a basic method of organization of human activity—interactive game-playing with multiple people—on generic hardware," such a characterization both ignores the stated purpose of the patented invention and the limitations of the claims themselves.  The Court declines the invitation to read Section 101 so broadly as to have it "swallow all of patent law."  *Alice*, 134 S. Ct. at 2354 (citing *Mayo*, 566 U.S. at —, 132 S. Ct. at 1293-94).[2]

Consequently, the claims of the '124 Patent carry an inherent risk of pre-emption substantially less than the claims held to be patent-ineligible by the Supreme Court.  Indeed, Defendant acknowledges that even "when all of the claim's generic computer and communications components . . . are stripped away, all that remains is the underlying concept of multi-player gaming using a hand-held controller that has a display screen where the players are also in front of a shared display."  (Mot. 6.)  Thus, Defendant concedes that even under its preferred view of

---

[2] Tellingly, Defendant admits that although "it is true that the invention here uses computer technology . . . that does not prevent it from **including** an abstract idea."  (Mot. 7 (emphasis added).)  As the Supreme Court in *Alice* made clear, however, "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'"  *Alice*, 134 S. Ct. at 2354 (citing *Mayo*, 556 U.S. at —, 132 S. Ct. at 1293-94).  Thus, that a patent claim might "include" an abstract idea cannot, by itself, render the claim patent-ineligible under Section 101.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: <u>CV 15-05202 SJO (JCx)</u>    DATE: <u>November 10, 2015</u>

the to-be-construed claim terms, the holder of the '124 Patent would only hold the right to exclude multi-player gaming products that permit players to use hand-held controllers in front of a shared screen.³ The Court has difficulty characterizing the '124 Patent as claiming the "'buildin[g] block[s]' of human ingenuity" or "disproportionately tying up the use of" any underlying abstract idea.⁴ *Alice*, 134 S. Ct. at 2354-55 (citing *Mayo*, 566 U.S. at —, 132 S. Ct. at 1294, 1303).

When viewed in this light, the claims at issue here are far more similar to those in both *Diamond v. Diehr* and *DDR Holdings, LLC v. Hotels.com, L.P.* than to those in the cases cited by Defendant. In *Diamond v. Diehr*, the Supreme Court held that although the process at issue "admittedly employs a well-known mathematical equation, [the patent holders] do not seek to pre-empt the use of that equation." *Diehr*, 450 U.S. at 187. "Rather," the Supreme Court held, "they seek only to foreclose from others the use of that equation in conjunction with all of the other steps in their claimed process. These include installing rubber in a press, closing the mold, constantly determining the temperature of the mold, [et cetera]." *Id.* Similarly here, if one were to agree with Defendant's characterization that the claims are "directed to" the abstract idea of playing a game with a group of people—perhaps even where the game is a multi-player game using hand-held controllers—the claim limitations themselves further limit the use of these ideas to hand-held controllers that both have a "secondary game display [that] is complementary to the primary game display" and are "configured to download a game software module . . . prior to initiation of the multi-player game." ('124 Patent cols. 41-44.) At the very least, given that claim construction has not yet occurred, Defendant has not met its burden of establishing that these additional elements are simply "conventional steps, specified at a high level of generality" insufficient to supply an "inventive concept." *Mayo*, 566 U.S. at —, 132 S. Ct. at 1300, 1297, 1294.

---

³ The Court notes that the claims of the '124 Patent on their face further require that the controllers have a "secondary game display [that] is complementary to the primary game display" and be "configured to download a game software module . . . prior to initiation of the multi-player game," both of which further limit the preemptive reach of the '124 Patent. (*See generally* '124 Patent.) Defendant selectively omits these limitations in its discussion of *Alice*/*Mayo* step 1. (Mot. 6-7.)

⁴ With respect to Defendant's concern that "the claims risk potentially preempting the concept of multi-player gaming with a shared display broadly" and might "jeopardize future innovation disproportionately 'relative to the contribution of the inventor'" (Mot. 14), other patentability doctrines—such as anticipation (35 U.S.C. section 102), obviousness (35 U.S.C. section 103), and enablement or written description (35 U.S.C. section 112)—are better equipped to determine the scope of the patentee's invention and whether the patent actually claims that invention. *See* 35 U.S.C. §§ 102, 103, 112. These doctrines, which "serve a critical role in adjusting the tension, ever present in patent law, between stimulating innovation by protecting inventors and impeding progress by granting patents when not justified by the statutory design," play a larger role in ensuring an invention is patentable than does the "threshold test" that is Section 101. *Bilski*, 561 U.S. at 609, 602.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| | |
|---|---|
| **CASE NO.:** CV 15-05202 SJO (JCx) | **DATE:** November 10, 2015 |

Similarly, in *DDR Holdings*, the Federal Circuit deemed patent-eligible system claims that "address the problem of retaining website visitors that, if adhering to the routine, conventional functioning of the Internet hyperlink protocol, would be instantly transported away from a host's website after 'clicking' on an advertisement and activating a hyperlink." *DDR Holdings*, 773 F.3d at 1257.  The claims themselves recited a system that, among other things, (1) "stores 'visually perceptible elements' corresponding to numerous host websites in a database, with each of the host websites displaying at least one link associated with a product or service of a third-party merchant;" (2) "on activation of this link by a website visitor, automatically identifies the host;" and (3) "instructs an Internet web server of an 'out-source provider' to construct and serve to the visitor a new, hybrid web page that merges content associated with the products of the third-party merchant with the stored 'visually perceptible elements' from the identified host website."  *Id.*

The Federal Circuit in *DDR Holdings* first noted that the claims did not "broadly and generically claim 'use of the internet' to perform an abstract business practice (with insignificant added activity)."  *Id.* at 1258.  Specifically, the Federal Circuit held that the "claims at issue here specify how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink."  *Id.*  Because the claimed system contained limitations that, when "taken together as an ordered combination . . . recite an invention that is not merely the routine or conventional use of the Internet."  *Id.* at 1259.  Indeed, the Federal Circuit found that the patent did not "attempt to preempt every application of the idea of increasing sales by making two web pages look the same," but rather recited "a specific way to automate the creation of a composite web page by an 'outsource provider' that incorporates elements from multiple sources in order to solve a problem faced by websites on the Internet."  *Id.*  As such, the Federal Circuit held that the "claimed solution amounts to an inventive concept for resolving this particular Internet-centric problem, rendering the claims patent-eligible."  *Id.*

The Court notes that the idea underlying the patent at issue in *DDR Holdings*—keeping a website user on a site when the user clicks an ad—is more easily characterized as "abstract" than the one underlying the '124 Patent.  Notwithstanding the possibility that patent was "directed to" such an abstract idea, the Federal Circuit found the claims at issue to pass muster under Section 101 by examining both the purpose of the patent  at issue, determining that the patent solves a problem unique to the computer field, and finding that the risk of pre-emption was minimal in light of specific additional limitations placed on the invention.  *Id.* at 1259.  Similarly here, Plaintiff has pointed to sections of the '124 Patent specification and the patent's prosecution history indicating that the patent is designed to solve a problem particular to the realm of multi-player gaming.  (*See* Opp'n; Steussy Decl., Exs. 2-4.)  Defendant has failed to adequately address this key distinction.

Moreover, although the Court does not endeavor to construe the claims of the '124 Patent at this juncture, the Court notes that each of the thirty-eight claims recites a "multi-player game system" in the preamble and contains limitations involving handheld controllers with separate screens and software download capabilities.  (*See* '124 Patent cols. 41-44.)  Unlike the system claims at issue

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.: CV 15-05202 SJO (JCx)                        DATE: November 10, 2015

in *Alice* and other cases cited by Defendant, these system claims recite hardware that is not, on its face, "purely functional and generic," such as the "data processing system" with a "communications controller" and "data storage unit" that are found in "[n]early every computer." *Alice*, 134 S. Ct. at 2360. Instead, at least some of these hardware elements, including a hand-held gaming controller equipped with a screen and the capability of downloading software, "offer[] a meaningful limitation beyond generally linking 'the use of the [method] to a particular technological environment,' that is, implementation via computers." *Id.* (citing *CLS Bank Intern. v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1291 (Fed. Cir. 2013) (Lourie, J., concurring)). None of the cases cited by Defendant even hint that such a hand-held game controller is "purely functional and generic."

Even if every software component and piece of hardware recited in the '124 Patent claims were "purely functional and generic," however, the claims would not necessarily be patent-ineligible. Indeed, the proposition that a court should "dissect the claims into old and new elements and then [] ignore the presence of the old elements in the analysis" was specifically rejected by the Supreme Court in *Diamond v. Diehr*. *Diehr*, 450 U.S. at 188. Moreover, the Supreme Court instructs that courts ask whether the limitations, "considered both individually and 'as an ordered combination,' ' transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 566 U.S. at —, 132 S. Ct. at 1298, 1297). In *Alice*, the Supreme Court held that the computer components at issue "ad[ded] nothing . . . that is not already present when the steps are considered separately" because they "do not, for example, purport to improve the functioning of the computer itself . . . [n]or do they effect an improvement in any other technology or technical field." *Alice*, 134 S. Ct. at 2359 (internal citations omitted). Here, by contrast, the specification and file history of the '124 Patent indicate that the individual components of the claimed system operate together to improve the functioning of multi-player gaming systems in a manner that was sufficiently novel to satisfy the Patent and Trademark Office Examiner. (*See* Steussy Decl., Exs. 2-5.) Defendant has failed offer an argument as to why *Diehr* does not control in this instance.

III.    RULING

For the foregoing reasons, the Court **DENIES** Audience Entertainment LLC's Motion to Dismiss. Defendant has fourteen (14) days from the issuance of this Order to file an Answer.

IT IS SO ORDERED.